RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK

DATE _6 / 2 /14_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

b

SHARON MCCARTY,
      Appellant

CIVIL ACTION
1:13-CV-01247

VERSUS

U.S. COMMISSIONER OF
SOCIAL SECURITY,
      Appellee

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Sharon McCarty ("McCarty") filed an application for disability insurance benefits ("DIB") on January 18, 2011 when she was 61 years old, and an application for supplemental security income ("SSI") on July 18, 2011 when she was 62 years old, alleging a disability onset date of December 1, 2008 (Tr. pp. 129, 137, 160) due to blindness in left eye, vision loss in her right eye, histoplasmosis in her eyes and lungs, diabetes, migraine, seizures, and nerve pain (Tr. p. 172). Those applications were denied by the Social Security Administration ("SSA") (Tr. p. 82).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on January 25, 2012, at which McCarty appeared with her attorney and a vocational expert ("VE") (Tr. p. 32). The ALJ found that, although McCarty has severe impairments of vision loss in her left eye, migraine, impaired vision in the right eye, mild airway obstruction, obesity, mild mitral valve regurgitation, mild diastolic dysfunction, diabetes, and hypertension (Tr. p. 19), she has the residual functional capacity to perform medium work except

for work that requires good binocular vision or good acuity for distances, and she should avoid exposure to concentrated pulmonary irritants (Tr. p. 20). The ALJ concluded that McCarty can do her past relevant work as a bookkeeper and, therefore, she was not disabled as defined in the Social Security Act at any time from December 1, 2008 through the date of her decision on April 30, 2012 (Tr. pp. 23-24).

McCarty requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

McCarty next filed this appeal for judicial review of the Commissioner's final decision. McCarty raises the following issues for review on appeal (Doc. 12):

> 1. The ALJ erred in failing to follow Social Security Ruling 02-1p in spite of finding McCarty's obesity to be severe.
>
> 2. The ALJ failed to follow Social Security Ruling 82-62, requiring specific findings and analysis of the demands of McCarty's past work.
>
> 3. There is an absence of evidence to support the ALJ's finding on past work, and substantial evidence does not support the ALJ's conclusion.

The Commissioner filed a brief in opposition to McCarty's appeal (Doc. 13). McCarty's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act.

42 U.S.C. 1381(a).   Eligibility is dependent upon disability, income, and other financial resources.   42 U.S.C. 1382(a).   To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.   Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.   42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.   42 U.S.C. 416(I), 423.   Establishment of a disability is contingent upon two findings.   First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. 423 (d)(1)(A).   Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. 423(d)(2).

### Summary of Pertinent Facts

McCarty has a high school education and past relevant work as a bookkeeper (1987-1988, 2007-2008), a lawn-mowing service (self-employed) (2001-2003), and a truck owner (used for commercial hauling) (1998-2000) (Tr. p. 183).

3

1. Medical Records

In November 2004, McCarty was evaluated at the Vitreoretinal Institute by Dr. Stephen Breaud, an ophthalmologist, for complaints of blurred vision; her vision was 20/30 in the right eye and 20/70 in the left eye (Tr. p. 532).  Dr. Breaud diagnosed subretinal neovascularization histoplasmosis,[1] and prescribed laser

---

[1] According to the National Eye Institute, "Facts About Histoplasmosis," *available at* https://www.nei.nih.gov/health/histoplasmosis/histoplasmosis.asp:

"Histoplasmosis is a disease caused when airborne spores of the fungus Histoplasma capsulatum are inhaled into the lungs, the primary infection site. This microscopic fungus, which is found throughout the world in river valleys and soil where bird or bat droppings accumulate, is released into the air when soil is disturbed by plowing fields, sweeping chicken coops, or digging holes.
"Scientists believe that Histoplasma capsulatum (histo) spores spread from the lungs to the eye, lodging in the choroid, a layer of blood vessels that provides blood and nutrients to the retina.
"Histoplasmosis is often so mild that it produces no apparent symptoms. Any symptoms that might occur are often similar to those from a common cold. In fact, if you had histoplasmosis symptoms, you might dismiss them as those from a cold or flu, since the body's immune system normally overcomes the infection in a few days without treatment.
"However, histoplasmosis, even mild cases, can later cause a serious eye disease called ocular histoplasmosis syndrome (OHS), a leading cause of vision loss in Americans ages 20 to 40.
"OHS usually has no symptoms in its early stages; the initial OHS infection usually subsides without the need for treatment. This is true for other histo infections; in fact, often the only evidence that the inflammation ever occurred are tiny scars called "histo spots," which remain at the infection sites. Histo spots do not generally affect vision, but for reasons that are still not well understood, they can result in complications years--sometimes even decades--after the original eye infection. Histo spots have been associated with the growth of the abnormal blood vessels underneath the retina.

photocoagulation for the left eye and Lotemax (Tr. p. 532). McCarty was the same in December 2004 and in February and March 2005 (Tr. pp. 529-531).

In May 2007, McCarty was treated for a sinus headache that progressed into migraine and caused vomiting (Tr. pp. 398-401). McCarty was prescribed Nabsin and Phenergan (Tr. p. 399). In June 2007, McCarty was treated for coughing and acute sinusitis (Tr. pp. 282, 507). In December 2007, McCarty was treated for bronchitis (Tr. pp. 280-281).

In February 2008, McCarty was evaluated for complaints of chest discomfort for several seeks, involving several episodes of chest pressure with no precipitating event (Tr. pp. 279, 504). McCarty's blood pressure was 125/75 and her weight was 219 pounds (Tr. p. 279). Prinz Metal angina was suggested, Hyzaar was discontinued and Cardizem CD was prescribed (Tr. p. 279). An x-ray in July 2008 showed that McCarty does not have acute cardiopulmonary disease, although she has some aortic insufficiency (Tr. pp. 415, 442).

In March 2008, Dr. Breaud examined McCarty for ischemic optic neuropathy, and diagnosed a retinal migraine (Tr. p. 528).

---

"In later stages, OHS symptoms may appear if the abnormal blood vessels cause changes in vision. For example, straight lines may appear crooked or wavy, or a blind spot may appear in the field of vision. Because these symptoms indicate that OHS has already progressed enough to affect vision, anyone who has been exposed to histoplasmosis and perceives even slight changes in vision should consult an eye care professional.
"OHS cannot be cured. Once contracted, OHS remains a threat to a person's sight for their lifetime."

In July 2008, Mccarty had another episode of chest pain which was treated with nitroglycerin SL (Tr. pp. 278, 503).

In March 2009, McCarty's blood sugar was high (Tr. p. 290) and she was prescribed Metformin (glucophage) and a diabetic diet, and instructed to check and record her blood sugar daily and exercise (Tr. pp. 289, 512). McCarty was diagnosed with diabetes mellitus II, hypercholesterolemia, and hypertension, as well as a panic attack (Tr. pp. 275, 438, 500).  In July 2009, McCarty's blood sugar was still high, so her medications were increased (Tr. pp. 287-288).  A chest x-ray showed a calcified granuloma in the left mid-lung (Tr. p. 457).

In June 2009, McCarty went to the LSU Health Sciences Center for complaints of chest pain (Tr. p. 239).  She was 5'7½," weighed 240 pounds, and her blood pressure was 137/76 (Tr. p. 239).  See was sent to the cardiology clinic (Tr. p. 240).  McCarty was also seen for complaints of chest pain for seven to eight months; her chest pains were determined to be atypical (Tr. p. 539).

McCarty was treated for a cough in July 2009 and September 2009(Tr. pp. 272, 435-436).  In October 2009 McCarty had bilateral wheezing without fever, shortness of breath, and a dry cough (Tr. pp. 268-270, 431-433, 493-496).

McCarty was evaluated in the cardiology clinic at the LSU Health Sciences Center in November 2009 for atypical chest pain; she was 5'7¾" tall, weighed 240 pounds, and her blood pressure was 125/76 (Tr. p. 228).  A CT scan and a chest x-ray showed an enlarged right hilum vascular versus adenopathy and calcified left

lung granuloma (Tr. pp. 455-456).  An echocardiogram and stress test showed normal left ventricular systolic function and wall motion with an estimated ejection fraction of 65-70 percent, normal right ventricular systolic function, mild mitral valve regurgitation, impaired relaxation suggestive of mild diastolic dysfunction, and small anterior pericardial effusion (Tr. pp. 246-247, 249).  McCarty was diagnosed with hypertension (Tr. p. 230).  McCarty's medications (Hyzaar, Vytorin, Lasix, Neurontin, and Metformin) were continued (Tr. p. 229).

In April 2010, McCarty again had a cough (Tr. pp. 267, 402) and, in June 2010, McCarty was diagnosed with acute bronchitis and prescribed Rocephin (Tr. pp. 265-266, 428-430, 488).

In July 2010, McCarty was 61 years old, her blood pressure was 127/83, and she weighed 230 pounds (Tr. p. 242).  McCarty had a chronic cough and nodules were found in her right lung (Tr. pp. 245, 248).  Although McCarty never smoked, she had been exposed to secondhand smoke for 43 years (Tr. p. 245).  McCarty also reported that she has histoplasmosis in her eyes, which was diagnosed twelve years ago (Tr. p. 245).

In November 2010, McCarty was treated for acute sinusitis and acute bronchitis (Tr. p. 251).

Dr. Breaud re-evaluated McCarty in December 2010 and diagnosed histoplasmosis, unspecified, retinitis, and retinal edema in the left eye (Tr. p. 527).  Dr. Breaud found that McCarty's visual acuity was 20/40 in her right eye and CF (counting fingers) in her left eye (Tr. p. 527).  Dr. Breaud noted retinal scars in both eyes

with active hemorrhage and edema in the left eye, and recommended intraocular injection of anti-inflammatory medication in the left eye, for which he referred her to the LSU Eye Clinic (Tr. p. 303). Later in December 2010, McCarty was given an Avastin injection for the histoplasmosis and CNV, or choroidal neovascularization,[2] in her left eye (Tr. pp. 259, 477-479).  McCarty also had cataracts (Tr. p. 479).

In February 2011, there were scars on the retinas of both of McCarty's eyes, and edema in the left eye (Tr. p. 476).  McCarty's visual acuity was 20/60 in her right eye and HM (hand motion[3]) in her left eye (Tr. pp. 308, 472-474).   In March 2011, exudate and edema were noted in McCarty's left eye, an Avastin injection was given, and a course of Prednisone was prescribed (Tr. p. 471). McCarty also had a scar on her right retina (Tr. pp. 471, 474).

McCarty was evaluated by Dr. G. Tillman on March 29, 2011 for the state's Disability Determinations Services (Tr. pp. 316-317). Dr. Tillman, an internal medicine doctor, found that McCarty's vision in each eye is 20/200 uncorrected and that she does not have corrective lenses (Tr. p. 317).   Dr. Tillman also found that

---

[2] Wet macular degeneration develops when new blood vessels called choroidal neovascularizations ("CNVs") grow from the choroid underneath the macular portion of the retina.  The new blood vessels leak fluid or blood-hence the term "wet macular degeneration."  This causes your central vision to blur. MEDLINEplus Health Information, Tutorials: "Macular Degeneration," *available at* http://www.nlm.nih.gov/medlineplus/ tutorials/maculardegeneration/htm/index.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[3] "Hand motion" means the ability to distinguish a hand if it is moving or not in front of the patient's face.

McCarty was 5'7½" tall, weighed 238 pounds, her blood pressure was 140/70, and an x-ray showed that she has a small calcified granuloma in the left peripheral lung (Tr. pp. 317, 354, 365, 372). Dr. Tillman diagnosed decreased distant visual acuity, obesity, possible seizure disorder, and migraine headaches; he did not find a functional deficit except for her decreased visual acuity (Tr. p. 317).

McCarty continued to have coughing problems in January, March and May 2011 (Tr. pp. 482, 485-487).  A pulmonary function study in May 2011 showed McCarty has a mild airway obstruction with a significant bronchodilator response compatible with a component of asthma (Tr. p. 330).  McCarty was treated for acute bronchitis, given intravenous antibiotics, and prescribed Zithromax (Tr. pp. 385, 389-391, 420, 483-484).

In April 2011, McCarty's right eye vision was 20/80 and her left eye vision was HM (Tr. pp. 319, 465).  CNV, or choroidal neovascularization was noted in her left eye, which was treated with an Avastin injection (Tr. p. 467).  Although McCarty had cataracts, they were not significant enough for surgery (Tr. p. 467).

In May 2011, McCarty continued to complain of a nonproductive cough, she had end expiratory wheezes bilaterally and she was diagnosed with bronchitis and prescribed Temazepam and cough medicine (Tr. pp. 580-581).

In July 2011, a CT scan of McCarty's thorax showed stable (over a period of a year) subcentimeter calcified and noncalcified

nodules in both lungs that are consistent with old granulomatous disease[4] (Tr. p. 540).

In December 2011, McCarty's left eye visual acuity was Hand Movement and her right eye was 20/50 (Tr. p. 567).  She has a large central scotoma (a non-seeing area in the visual field surrounded by a seeing area[5]) in the left eye (Tr. p. 568).

In January 2012, McCarty was seen for her diabetes mellitus, type II, and her medications were continued (Tr. p. 554).

In December 2011 and February 2012, McCarty had a posterior vitreous detachment with a vitreous hemorrhage in the left eye (causing "spiderweb" floaters), presumed ocular histoplasmosis in the right eye, and an asymptomatic pterygium (a benign growth of the conjunctiva) in the right eye (Tr. pp. 5564-569).  McCarty was referred to a low vision specialist for her left eye (Tr. p. 566).

In early May 2012, McCarty's vision was the same, and she received an Avastin injection in her left eye (Tr. pp. 594, 602).  In June 2012, McCarty reported a sudden dull haze over her left eye for two weeks (Tr. p. 670).  McCarty's vision was 20/50 in the

---

[4] Chronic granulomatous disease (CGD) is a genetic disorder in which certain immune system cells are unable to kill some types of bacteria and fungi. The disorder leads to long term (chronic) and repeated (recurrent) infections. The condition is often discovered in very early childhood. Milder forms may be diagnosed during the teen years or even in adulthood. MEDLINEplus Health Information, Medical Encyclopedia: Chronic Granulomatous Disease, *available at* http://www.nlm.nih.gov/ medlineplus/ency/article/001239.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[5] 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 2.00(A)(8)(c), "Scotoma."

right eye and light and hand motion in the left eye (Tr. p. 670), and she was diagnosed with presumed ocular histoplasmosis in her left eye, cataracts, posterior vitreous detachment (retinal detachment precautions) in her right eye, a pterygium, and diabetic retinopathy (Tr. pp. 669, 672).

In August 2012, McCarty's vision was 20/60 in her right eye and counting fingers at two feet in her left eye (Tr. p. 667). McCarty was again diagnosed with presumed ocular histoplasmosis in her left eye, cataracts, posterior vitreous detachment (retinal detachment precautions) in her right eye, and a pterygium (Tr. p. 669).

In September 2012, McCarty complained of seizures twice a week for about a month, each lasting three or four minutes before she feels sleepy, after which she feels fine but does not remember anything (Tr. p. 665). McCarty was placed on seizure precautions, prescribed Keppra, and an MRI of her brain and an EEG were scheduled (Tr. p. 665). The MRI was normal and did not show any metastatic disease (Tr. p. 673).

### 2. January 2012 Administrative Hearing

At her January 2012 administrative hearing, McCarty testified that she lives with her husband and she completed high school (Tr. p. 38). McCarty testified that her husband is attempting to work (Tr. p. 38), but she does not have any income (Tr. p. 40).

McCarty testified that she was not self-employed in 2008, but instead worked for a grain-hauling business, doing bookkeeping (Tr. pp. 38-39). McCarty testified that she did spreadsheets, fill

sheets, reported mileage, reported the nature, number of bushels and weights of whatever the trucks hauled, and calculated that (Tr. p. 39). McCarty explained that the truck drivers would take their tickets to her and she would copy from the tickets the number of bushels (the load) and how much they had received per bushel in order to calculate the total load and enter it into the spreadsheet (Tr. pp. 53-54). McCarty testified that the print on the tickets was regular size (much of it handwritten) and McCarty became unable to see it (Tr. p. 54). McCarty testified that it was a full time job during harvest season, which lasted from June or July through December, then they had a break for one to two months before it picked up again (Tr. pp. 39-40). McCarty testified she stopped working at the end of 2008 because she was having trouble seeing, she could not distinguish the numbers and the bushel weights, she was having headaches, and she continually had bronchitis (Tr. p. 40).

McCarty also testified that she cannot read newspaper print, although she can read larger print such as headlines (Tr. p. 54). McCarty testified that the print on the tickets was smaller than the newspaper print (Tr. p. 54). McCarty testified that she also has difficulty reading from a computer screen unless it is enlarged (Tr. p. 55). McCarty testified that she cannot do her past work as a secretary because she can no longer read from a computer or spreadsheet, she cannot type, and she cannot read mail without a magnifying glass (Tr. p. 55).

12

McCarty testified that she has vision problems and is being seen at LSU Medical Center, where she gets injections in her eye (Tr. p. 40).  McCarty testified that further injections have been postponed until about February 2012 because an injection takes about fifteen minutes to complete and she is unable to stop coughing for that long due to "coughing pneumonia" (Tr. p. 40). McCarty testified that her eye doctors have not prescribed new glasses for her because her left eye vision cannot be improved, and her right eye vision is impaired on the side, which cannot be corrected (Tr. p. 41).  McCarty testified that her eye doctors told her to get the strongest pair of over-the-counter glasses (Tr. p. 41).

McCarty further testified that, in December 2011, she developed what appeared to be bloody spider webs across her vision (Tr. p. 42).  Soon after that, McCarty developed PVD, where the [vitreous] gel detached itself from her retina and started moving in her eye, causing a visual disturbance like a butterbean floating across her vision.  McCarty testified that she sees the veins and blood in the floating gel (Tr. p. 43).  McCarty testified that her eye doctor told her that, although there is a surgery to try to correct the problem, it usually makes the problem worse (Tr. p. 43).

McCarty testified that her right eye has problems caused by histoplasmosis and hemorrhaging; the histoplasmosis "fold" has leaked and hemorrhaged on the outside area of her vision (Tr. p. 43).  McCarty testified that her right eye hemorrhaged so much, the

doctor cauterized and sealed off the veins, causing black spots (Tr. p. 43). McCarty testified that, where she has black spots in her right eye vision, her vision will never return (Tr. p. 43). McCarty testified that she has lost the vision in her right eye to one side (Tr. p. 43).

McCarty testified that her ability to read started worsening in about 2008, although she had her first hemorrhage in 2004, and she was diagnosed with histoplasmosis; all she could see though her eye was blood (Tr. p. 44). McCarty testified that is when the cauterization was done in her eye (Tr. p. 44). Since then, she has had four more small hemorrhages in her left eye, and two in the side of her right eye (Tr. p. 45).

McCarty testified that she is not supposed to drive and her husband and daughter have been driving her around for the last year, but she still tries to drive sometimes (Tr. p. 45). McCarty also testified that she has been trying to stay out of dust and smoke, so she had not had bronchitis in the last six months although she coughed some; she has nodules in her lungs, two of which are fairly large (Tr. pp. 46-47). McCarty testified that she gets fatigued and short of breath when she does things around the house, such as sweep, mop, or vacuum, or when she walks (Tr. p. 47), which she can do for about ten minutes before she has to stop and rest for about ten minutes (Tr. pp. 48, 57). McCarty testified that she can walk for about ten minutes before she gets short of breath, then has to slow down until she catches her breath; during a twenty minute walk she has to stop or slow down at least once

14

(Tr. pp. 48-49).  McCarty testified that she does not use a scooter at the grocery store, but leans on her grocery cart (T. p. 49). McCarty testified that she can no longer mow grass, rake, or burn leaves because of her problems with bronchitis and pneumonia (Tr. p. 50).

McCarty testified that she has histoplasmosis and scarring in her lungs, and that the hemorrhaging that is happening in her eye is also happening in her lungs (Tr. p. 50).  McCarty testified that she wakes up at night because she is unable to catch her breath, so she sleeps on two pillows (Tr. p. 52).  McCarty takes Albuterol (inhaler) and another medication for her respiratory problems (Tr. p. 51).  McCarty testified that she uses them only when she has shortness of breath (Tr. pp. 51-52); McCarty testified that she used her inhaler on two different days in the past week (Tr. p. 52).  McCarty testified that her inhaler gives her relief in about two minutes and it makes her feel hyper and edgy for five to ten minutes, but it does not affect her ability to function (Tr. p. 52).

McCarty testified that, in addition to dust and grass, other irritants that cause her breathing problems are some perfumes and colognes and some cleaning fluids (Tr. p. 56).  McCarty testified that the dust at her work site, from the grains hauled by the trucks, really aggravated her breathing problems (Tr. p. 57). McCarty testified that, inside her home, vacuuming and mopping irritate her breathing the worst (Tr. p. 57).  McCarty further testified that, since she has problems sleeping at night, she falls

15

asleep three or four times during the day when she sits down, between about 8:30 a.m. and 4:30 p.m. (Tr. p. 58).

The Vocational Expert ("VE") testified that McCarty's past work as a bookkeeper at a grain elevator was skilled, sedentary work (SVP 6, DOT number 210.382-014) (Tr. p. 60).  The VE further testified that her job as a bookkeeper at a grain elevator was very dependent on her having good vision for reading ordinary type the size of a newspaper or a book; if a person could not read an ordinary newspaper type, they would have significant difficulty doing that job (Tr. p. 60).  The VE testified that a person who can only see a large font size would not be able to see much of a spreadsheet on a computer screen, so she may not be able to do the computer work and would not be able to read anything else (Tr. p. 61).[6]

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether McCarty (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not

---

[6] The ALJ did not ask the VE any hypothetical questions.

disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that McCarty has not engaged in substantial gainful activity since December 1, 2008 (Tr. p. 19), that she has disability insured status for blindness only (Tr. p. 18), and that she has severe impairments of vision loss in the left eye, migraine, impaired vision in the right eye, mild airway obstruction, obesity, mild mitral valve regurgitation, mild diastolic dysfunction, diabetes, and hypertension, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 19).  The ALJ also found that McCarty has the residual functional capacity to perform medium work except for work that requires binocular vision or good acuity for distances, and she should avoid exposure to concentrated pulmonary irritants (Tr. p. 20).  The ALJ also found that, as of the date of the ALJ's decision on April 30, 2012,

17

McCarty was still able to perform her past relevant work as a bookkeeper for a trucking company (Tr. p. 23).  The sequential analysis thus ended at Step 4, with a finding that McCarty was not disabled within the meaning of the Social Security Act from December 1, 2008 through April 30, 2012 (Tr. p. 23).

Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th

Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).
The resolution of conflicting evidence and credibility choices is
for the Commissioner and the ALJ, rather than the court. Allen v.
Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v.
Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have
authority, however, to set aside factual findings which are not
supported by substantial evidence and to correct errors of law.
Dellolio, 705 F.2d at 125. But to make a finding that substantial
evidence does not exist, a court must conclude that there is a
"conspicuous absence of credible choices" or "no contrary medical
evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);
Dellolio, 705 F.2d at 125.

## Law and Analysis

### Issue 1 - Obesity

First, McCarty contends the ALJ erred in failing to follow
Social Security Ruling 02-1p in spite of finding McCarty's obesity
to be severe. McCarty argues that her obesity precludes her from
being able to do medium level work because she cannot crouch and
stoop to lift things weighing up to 25 pounds frequently and 50
pounds occasionally.

S.S.R. 02-1p, "Evaluation of Obesity," states in pertinent
part:

> "In the final rule, we added paragraphs to the prefaces
> of the musculoskeletal, respiratory, and cardiovascular
> body system listings that provide guidance about the
> potential effects obesity has in causing or contributing
> to impairments in those body systems. See listings
> sections 1.00Q, 3.00I, and 4.00F. The paragraphs state
> that we consider obesity to be a medically determinable
> impairment and remind adjudicators to consider its

19

effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."

Listing 3.00(I) states,

"Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairment considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."

In the case at bar, the ALJ briefly discussed McCarty's obesity and stated she had considered its effect in combination with McCarty's impairments in determining McCarty's residual functional capacity.  The ALJ also wrote that Dr. Tillman had noted McCarty's obesity in his consultative exam.

However, the ALJ did not set forth any reasons for finding McCarty has the residual functional capacity to perform medium work; she apparently pulled it out of thin air (Tr. p. 22).  No medical doctor discussed McCarty's ability to lift, carry, stand, and walk, nor was McCarty's past relevant work as a bookkeeper medium level work-it was sedentary.  Comparing the exertional

20

requirements for medium work[7] with McCarty's obesity, her age, her
testimony as to her limited ability to stand and walk, and her
respiratory problems, there is no evidence that supports the ALJ's
conclusion that McCarty has the residual functional capacity to
perform medium work.

Substantial evidence does not support the ALJ's/Commissioner's
finding that McCarty has the residual functional capacity to do
medium level work.

Issues 2 & 3 - Past Work

The ALJ failed to follow Social Security Ruling 82-62 ("A
Disability Claimant's Capacity to do Past Relevant Work, in
General"), which requires specific findings and analysis of the
demands of McCarty's past work. The VE testified that McCarty's
past relevant work as a bookkeeper for a trucking company was
sedentary work which she could no longer do because of her vision
impairments.

The ALJ's only statement as to the nature of McCarty's past
relevant work was that she did "bookkeeping/spreadsheets/reports
mileage at a trucking company" (Tr. p. 23). The ALJ did not
discuss the physical requirements of that job other than to state

---

[7] "Medium work" is defined in 20 C.F.R. § 404.1567(c) and §
416.967(c) as follows: "Medium work involves lifting no more than
50 pounds at a time with frequent lifting or carrying of objects
weighing up to 25 pounds. If someone can do medium work, we
determine that he or she can also do sedentary work and light
work." A job is in the light work category "when it requires a
good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg
controls." 20 C.F.R. § 404.1567(b); § 416.967(c); S.S.R. 83-10,
"Determining Capability to do Other Work-The Medica-Vocational
Rules of Appendix 2."

that she needed to be able to read "ordinary type" and then find that McCarty is able to read ordinary type (Tr. p. 23).

The ALJ stated that, at no time between 2008 and 2012, was McCarty's visual acuity less than 20/30 corrected in her right eye and 20/50 corrected in her left eye (Tr. p. 23).

It is evident that the ALJ either did not read or did not understand McCarty's medical records.  If that was so, the ALJ should have employed a medical expert to explain the records.

McCarty's ophthalmology records reflect that McCarty's visual acuity was 20/30 in the right eye and 20/70 in the left eye in November 2004 (Tr. p. 532).   In December 2010, Dr. Breaud found that McCarty's visual acuity was 20/40 in her right eye and CF (count fingers) in her left eye (Tr. p. 527).   Dr. Breaud noted retinal scars in both eyes with active hemorrhage and edema in the left eye, and recommended intraocular injection of anti-inflammatory medication in the left eye, for which he referred her to the LSU Eye Clinic (Tr. p. 303).   Later in December 2010, the histoplasmosis and CNV in McCarty's left eye was treated with an Avastin injection (Tr. pp. 259, 477-479).   McCarty also had cataracts (Tr. p. 479).

In April 2011, McCarty's right eye vision was 20/80 and her left eye vision was HM (hand movement) (Tr. pp. 319, 465).   CNV, or choroidal neovascularization, was noted in her left eye, which was treated with an Avastin injection (Tr. p. 467).   Although McCarty had cataracts, they were not significant enough for surgery (Tr. p. 467).

22

In December 2011, McCarty's left eye vision was HM and her right eye was 20/50 (Tr. p. 567).   She had developed a large central scotoma (a non-seeing area in the visual field surrounded by a seeing area) in the left eye (Tr. p. 568).

In December 2011 and February 2012, McCarty had a posterior vitreous detachment with a vitreous hemorrhage in the left eye (causing "spiderweb" floaters), presumed ocular histoplasmosis in the right eye, and an asymptomatic pterygium (a benign growth of the conjunctiva) in the right eye (Tr. pp. 5564-569).

In early May 2012, McCarty's visual acutiy was still HM in her left eye and 20/50 in her right eye, and she received an Avastin injection in her left eye (Tr. pp. 594, 602).   In June 2012, McCarty reported a sudden dull haze over her left eye  for two weeks (Tr. p. 670).   McCarty's vision was 20/50ph in the right eye and light and hand motion in the left eye (Tr. p. 670).   McCarty reported noticing a sudden dull haze over her right eye two weeks prior which had been stable (Tr. p. 670).   One CNV, or choroidal neovascularization, was noted in her right eye (Tr. p. 672), as well as a pterygium which did not affect vision (Tr. p. 671).   Post vitreous detachment ("PVD") was noted in the left eye and precautions for PVD were given for the right eye (Tr. p. 672).   McCarty was diagnosed with presumed ocular histoplasmosis in her left eye, cataracts, posterior vitreous detachment (retinal detachment precautions) in her right eye, a pterygium, and diabetic retinopathy (Tr. pp. 669, 672).

In August 2012, McCarty's vision was 20/60-2 in her right eye

and counting fingers at two feet in her left eye (Tr. p. 667).
McCarty was diagnosed with presumed ocular histoplasmosis in her
left eye, cataracts, posterior vitreous detachment (and given
retinal detachment precautions)[8] in her right eye, and a pterygium
(Tr. p. 669).

The ALJ was incorrect in stating that McCarty's right eye
vision was 20/30 in February 2012.  The medical records shows that
her vision was 20/50 ph 30-1 (Tr. p. 564).  That means her visual
acuity was 20/50, but with the use of a pinhole occluder (which
temporarily corrects for refractive errors such as myopia or
astigmatism) her visual acuity was 20/30 with one error made on
that line of the reading chart.  However, according to McCarty, she
was not given prescription glasses, but was told to purchase the
strongest over-the-counter reading glasses.  Moreover, McCarty's
right eye vision measured 20/60 in August 2012.

It is also noted that the ALJ attempted to make findings as to
McCarty's visual field, finding she did not have any visual field

---

[8] According to the National Eye Institute,
"Although a vitreous detachment does not threaten
sight, once in a while some of the vitreous fibers pull
so hard on the retina that they create a macular hole
to or lead to a retinal detachment. Both of these
conditions are sight-threatening and should be treated
immediately.
"If left untreated, a macular hole or detached retina
can lead to permanent vision loss in the affected eye.
Those who experience a sudden increase in floaters or
an increase in flashes of light in peripheral vision
should have an eye care professional examine their eyes
as soon as possible."
National Eye Institute, "Facts About Vitreous Detachment,"
*available at* https://www.nei.nih.gov/health/vitreous/
vitreous.asp.

loss based on a March 2011 report by a state Disability
Determination Services physician. However, the ALJ failed to take
into account the changes in McCarty's vision since March 2011,
including a large central scotoma that developed in McCarty's left
eye in December 2011. Subtraction of a scotomoa from the visual
field area is required by Listing 2.00(A)(8)(c), which states: "c.
Scotoma. A scotomoa is a non-seeing area in the visual field
surrounded by a seeing area. When we measure the visual field, we
subtract the length of any scotoma, other than the normal blind
spot, from the overall length of any diameter on which it falls."
The ALJ failed to account for the effect of the scotoma in
McCarty's left eye on her visual field. Moreover, McCary is blind
in her left eye, which obviously affects her visual field (as well
as her depth perception). It is unclear why the ALJ failed to
consider that fact.

The evidence does not support the ALJ's conclusions that
McCarty's vision is 20/30 in her right eye and 20/50 in her left
eye, and that she has no loss to her field of vision. Since the
ALJ made erroneous findings as to McCarty's vision loss, the ALJ's
finding that McCarty can still work as a bookkeeper is not
supported by substantial evidence.

Moreover, McCarty testified that she became unable to read the
truckers' tickets in 2008. The VE noted that, although McCarty
could enlarge the type on a computer screen, she would not be able
to see much of the spreadsheet if she did so, and she could not
enlarge the truckers' tickets that she had to read. Although the

25

Vocational Expert clearly testified that McCarty would not be able to perform her past relevant work as a bookkeeper[9] (Tr. p. 61), the ALJ disregarded his expert testimony and erroneously substituted her own inexpert opinion that McCarty could work as a bookkeeper despite her vision impairments.

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.   A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specified job.   Fields v. Bowen, 805 F.2d 1168, 117a (5th Cir. 1986).

The ALJ appears to have rejected the VE's opinion because the ALJ (erroneously) found that McCarty's vision is not as impaired as McCarty claimed.   The medical evidence does not support the ALJ's findings as to McCarty's vision impairments and her residual functional capacity, and the ALJ erred in rejecting the VE's testimony that McCarty can no longer do her past work as a bookkeeper.   Therefore, substantial evidence does not support the ALJ's/Commissioner's finding that McCarty is able to perform her past relevant work as a bookkeeper.

Since substantial evidence does not support the conclusions of the ALJ and the Commissioner as to McCarty's residual functional

---

[9] The ALJ did not pose any hypothetical questions to the VE regarding other work which McCarty can perform given her impairments.

capacity, their decision is incorrect as a matter of law. However, this does not entitle McCarty to a decision in her favor based upon the existing record. The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy which McCarty can perform, given her true impairments. Therefore, McCarty's case should be remanded to the Commissioner for further proceedings.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that McCarty's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of June 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

28